22 A.3d 114 (2011)
420 N.J. Super. 583
STATE of New Jersey, Plaintiff-Respondent,
v.
Thomas W. EARLS, Defendant-Appellant.
No. A-2084-07T4.
Superior Court of New Jersey, Appellate Division.
Submitted March 22, 2011.
Decided July 11, 2011.
*116 Yvonne Smith Segars, Public Defender, attorney for appellant (Alison Perrone, Designated Counsel, on the brief).
Paula T. Dow, Attorney General, attorney for respondent (Brian Uzdavinis, Deputy Attorney General, of counsel and on the brief).
Before Judges PARRILLO, SKILLMAN and ROE.
The opinion of the court was delivered by
SKILLMAN, J.A.D. (retired and temporarily assigned on recall).
The primary issue presented by this appeal is whether the use of cell phone site information, obtained by the police without a warrant from a suspect's cell phone provider to determine his general location, violates the Fourth Amendment or Article I, paragraph 7, of the New Jersey Constitution. We conclude that the use of such information to determine a suspect's general location on public roadways or other places in which there is no legitimate expectation of privacy does not violate the suspect's constitutional rights.

I.
Defendant was indicted for burglary, in violation of N.J.S.A. 2C:18-2; theft of movable property, in violation of N.J.S.A. 2C:20-3(a); receiving stolen property, in violation of N.J.S.A. 2C:20-7(a); and possession of marijuana, in violation of N.J.S.A. 2C:35-10(a)(3). Defendant filed a motion to suppress the evidence against him. Following a three-day evidentiary hearing, the trial court delivered a comprehensive oral opinion granting the motion in one limited respect, but denying the motion as to most of the evidence against defendant. Defendant then entered into a plea bargain under which he agreed to plead guilty to the burglary and theft charges, and the State agreed to recommend an aggregate sentence of seven years imprisonment, with three years of parole ineligibility. The trial court sentenced defendant in accordance with the plea bargain to an extended seven-year term, with three years of parole ineligibility, for burglary, and a concurrent five-year term, with two-and-a-half years of parole ineligibility, for theft of movable property.
*117 Defendant filed an appeal from the judgment of conviction, which we heard on an excess sentence calendar. See R. 2:9-11. We affirmed defendant's sentence as not excessive by an oral opinion and order entered on June 23, 2009.
Defendant subsequently filed a motion to reopen his appeal to challenge the denial of his motion to suppress, which we granted. The State has not cross-appealed from the part of the trial court order suppressing a limited part of the evidence against defendant.
The searches that revealed the evidence upon which defendant's convictions are based were the result of a Middletown Township Police Department investigation of a series of residential burglaries. The victim of one of the burglaries reported that a cell phone taken from his home was still in active use. The police obtained a communications data warrant authorizing them to monitor the incoming and outgoing calls on this phone, which enabled the police to determine the identity of the person in possession of the phone. When the police arrested that person, he told them he had purchased the phone from defendant. That person also told the police defendant had been engaged in a series of residential burglaries and that he kept many of the items he had stolen in a storage unit leased either by defendant or his girlfriend, Desiree Gates.
The police subsequently located Gates and told her they believed defendant was keeping stolen property in a storage unit she had leased with him. Gates stated that she and defendant previously had a boyfriend-girlfriend relationship and confirmed they had leased a storage unit together. After Gates agreed to cooperate with the police, she showed them the storage facility where she and defendant had leased a unit. Although defendant paid the rent for the unit, it was leased solely in Gates' name, and Gates stored her summer clothing in it. However, defendant retained the sole key.
After the police arrived at the storage facility with Gates, she executed a written consent for the police to search the unit. Since Gates did not have a key, she also executed a form provided by the storage facility authorizing the breaking of the lock. Pursuant to these authorizations, the police entered the unit, where they discovered a substantial quantity of what appeared to be stolen property, including golf clubs, electronic equipment such as flat screen televisions, expensive jewelry, and sports memorabilia. Gates told the police the storage unit had contained only her property the last time she had been there and that she was unaware defendant was using it to store stolen property. The police seized the apparent stolen items and returned to police headquarters in the late afternoon.
Based on the evidence discovered in the storage unit and other evidence gathered in their investigation, the police obtained a warrant for defendant's arrest. In addition, Gates' cousin told the police defendant had threatened to harm Gates when he found out Gates had allowed the police access to the storage unit and that she had not seen Gates since the search of the unit. Consequently, Gates's cousin expressed concern about Gates's safety. The police undertook to find defendant both to execute the arrest warrant and to assure that he did not harm Gates.
In an effort to locate defendant for these purposes, the police contacted T-Mobile, which was defendant's cell phone carrier. T-Mobile was able to determine defendant's general location at any given time because every seven seconds, a cell phone scans for the strongest signal, which is usually from the nearest tower, and then registers with that tower by sending in a *118 signal to identify itself. See In re Pen Register & Trap/Trace Device with Cell Site Location Auth., 396 F.Supp.2d 747, 750 (S.D.Tex.2005). T-Mobile first notified the police around 8 p.m. that defendant was in the general area of Route 35 in Eatontown and then, after the police again contacted T-Mobile around 9:30 p.m., it notified them that defendant was in the general area around Routes 33 and 18 in Neptune. However, the police were unable to locate defendant in either of those areas. Around 11 p.m., the police again contacted T-Mobile, which notified them that defendant's cell phone was emitting signals in the general area of Route 9 in Howell. A search of that area revealed defendant's car in a motel parking lot.
By speaking with the clerk in the motel office, the police were able to determine the room in which defendant and Gates were staying. The police called the room, spoke to Gates, and later arrested defendant when he came to the door. At that time, the police observed a flat screen television and luggage in the middle of the room. The police entered the room and seized those items, which they brought back to police headquarters. While in the room, the police opened a dresser drawer in which they found a pillowcase filled with stolen property, which they also brought back to police headquarters.
After the police brought defendant to headquarters, he signed written consents for the police to search the luggage seized in the motel room. The searches of the luggage revealed additional stolen property and marijuana.
At the suppression hearing, defendant called Gates as a witness on his behalf. She testified that the police officers who presented the consent to search form for her to sign told her they could obtain a warrant in twenty minutes if she did not sign it. According to Gates, the police also told her that if they found any stolen property in the storage unit, she could be "charged with it." Gates testified that she only signed the consent form because she was "scared" and did not do so voluntarily.
Defendant also testified on his own behalf. He denied giving oral consent to the search of the dresser drawer in the motel room. Defendant admitted executing the consent to search form at police headquarters, but claimed that he did so only because he was afraid he would lose his property if he refused.
The trial court concluded in an oral opinion that Gates, as the person who had leased the storage unit, had authority to consent to a search of the unit. The court found Gates's testimony that she had been coerced into giving her consent to be incredible and upheld its validity. The court also concluded that a person generally would have a constitutionally protected privacy interest in preventing his cell phone provider from disclosing the general area where he is located, but that the police inquiries to T-Mobile concerning defendant's whereabouts were justified under the emergency aid exception to the warrant requirement because the police had an objectively reasonable basis for believing defendant planned to cause physical harm to Gates. Therefore, the court concluded that the police "lawfully obtained" information about defendant's presence in the general area of the motel and thus lawfully entered defendant's motel room to arrest him. The court further concluded that the seizure of the flat screen television and luggage that was in plain view inside the motel room was valid. However, the court found that the State had not proven that defendant or Gates gave verbal consent to the search of the dresser drawers and therefore suppressed evidence of the stolen jewelry contained in the pillowcase found in the drawer. Finally, *119 the court found that defendant's written consent to the search of the luggage found in the motel room was freely and voluntarily given and therefore denied defendant's motion to suppress the evidence found in that search.[1]
On appeal, defendant argues: (1) Gates did not have authority to consent to the search of the storage unit; (2) the monitoring of defendant's cell phone location was not justified under the emergency aid exception to the warrant requirement, and therefore, the evidence discovered in his motel room as a result of his arrest must be suppressed; and (3) even if the police entry into his motel room to arrest him was valid, the seizure of the flat screen television and luggage found in the room was not justified under the plain view exception to the warrant requirement.
We conclude that Gates had authority to consent to the search of the storage unit. We also conclude that defendant had no constitutionally protected privacy interest in preventing T-Mobile from disclosing information concerning the general location of his cell phone. Therefore, we uphold the validity of defendant's arrest based partly on that information without considering the applicability of the emergency aid exception. Finally, we reject defendant's argument that the seizure of the flat screen television and luggage was not justified under the plain view exception.

II.
"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249-50 (1974). A showing of such common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 171 n. 7, 94 S.Ct. at 993, 39 L.Ed.2d at 250. A determination whether a person has authority to consent to a search "must `be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148, 161 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). Our courts generally follow these same principles in determining the validity of a consent to search under Article I, paragraph 7, of the New Jersey Constitution.[2]See State v. Suazo, 133 N.J. 315, 319-20, 627 A.2d 1074 (1993); *120 State v. Coyle, 119 N.J. 194, 215-18, 574 A.2d 951 (1990).
Applying these principles, the Ninth Circuit Court of Appeals concluded in United States v. Kim, 105 F.3d 1579 (9th Cir.), cert. denied, 522 U.S. 940, 118 S.Ct. 353, 139 L.Ed.2d 275 (1997), that a lessee of a storage unit named Wee had actual authority to consent to a search of the unit even though the rental agreement indicated that other individuals, including the defendant Kim, also had a right of access, and Wee did not have possession of the key to the unit when he gave consent. In reaching this conclusion, the court stated:
By instructing Wee to lease the units in Wee's name, Kim assumed the risk that Wee could exercise his rights as lessee to have the storage company open the unit. In addition, Kim allowed Wee to keep possession of the leases, supervise unloading of the goods and retain the keys on occasion. At any time, Wee could have accessed the storage locker without Kim's knowledge or permission. Because Kim ceded partial control of the [storage] lockers to Wee at all times, and allowed him total control on occasion, he assumed the risk that Wee would allow a search of the units.
[Id. at 1582.]
Similarly, the Eleventh Circuit Court of Appeals concluded in United States v. Camp, 157 Fed.Appx. 121 (11th Cir.2005), that a woman named Compton, who leased a storage unit in her own name for the defendant, who was her "live-in companion," to store his illegally possessed firearms, and also stored her own firearms in the unit, could consent to a search even though the defendant had changed the lock and refused to give her a key. In reaching this conclusion, the court stated:
Here, there was both mutual use and joint access such that [defendant] and Compton had common authority over the storage unit in which the firearms were found, . . . and Compton, accordingly, could consent to a warrantless search of it. Compton and Camp both stored property in the unit (mutual use) and Compton retained joint access to the unit since she was the only name on the unit's lease.
[Id. at 123.]
We conclude that, as in Kim and Camp, Gates, as the lessee, had actual authority to consent to a search of the storage unit even though she did not possess the key to the lock when she gave that consent. As far as the operator of the storage facility was concerned, Gates was the only person with a right of access. She provided her driver's license with her photo and her insurance information in applying to lease the unit, and the lease was solely in her own name. Any right of access defendant may have had was a purely private arrangement between him and Gates, to which the operator of the storage facility was not a party. Moreover, although Gates permitted defendant to use the storage unit, she also stored her own personal belongings in it. And even though defendant had the key to the lock when the search was conducted, Gates undoubtedly could have gained access to the unit at any time simply by executing the storage facility's "Tenant Permission to Cut Off Lock" form, as she did after consenting to the search. Therefore, there was the same kind of "mutual use" and "joint access" to the storage unit by Gates and defendant as in Camp. Accordingly, we affirm the trial court's denial of defendant's motion to suppress evidence of the stolen property discovered in the storage unit.

III.
We turn next to defendant's argument that the trial court should have suppressed *121 evidence of the stolen property found in his motel room because the police violated his rights under the Fourth Amendment and its counterpart under the New Jersey Constitution by obtaining information about the general location of his cell phone from T-Mobile without a search warrant.
Initially, we note that defendant does not question the validity of the warrant for his arrest. Defendant also does not question the right of the police to execute that warrant in the motel room in which he was staying. See Payton v. New York, 445 U.S. 573, 602-03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639, 660-61 (1980); State v. Cleveland, 371 N.J.Super. 286, 294-95, 852 A.2d 1150 (App.Div.), certif. denied, 182 N.J. 148, 862 A.2d 57 (2004). Defendant's only argument is that because the police used information obtained from T-Mobile concerning the location of his cell phone to assist in determining where he could be found, the evidence found in the motel room must be suppressed as a fruit of the illegal search of his cell phone information.
The Supreme Court of the United States first addressed the validity of electronic tracking of a criminal suspect in United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). In that case, the government obtained information that three individuals were engaged in the manufacture of illicit drugs. Id. at 278, 103 S.Ct. at 1083, 75 L.Ed.2d at 59-60. One of the chemicals used in this manufacturing process was chloroform. Ibid. With the consent of the seller of the chloroform, the government installed a beeper in a container of chloroform that was subsequently sold to one of the participants in the drug manufacturing enterprise, Armstrong, who drove his car to the residence of another participant, Petschen, and transferred the container to his car. Ibid. Petschen then drove his car to a cabin occupied by the third participant, defendant Knotts. Ibid. The government was able to track the transportation of chloroform first to Petschen's house and then to Knotts' cabin by means of intermittent visual surveillance of Armstrong's and Petschen's cars and also by the electronic signals emanating from the beeper. Ibid. Based partly on that evidence, the government obtained a warrant for the search of Knotts' cabin, which revealed evidence that resulted in his conviction for a drug offense. Id. at 279, 103 S.Ct. at 1084, 75 L.Ed.2d at 60.
In rejecting Knotts's argument that the warrant was invalid because the government violated the Fourth Amendment by utilizing the beeper installed in the container of chloroform to track the chloroform's movement to his cabin, the court stated that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Id. at 281, 103 S.Ct. at 1085, 75 L.Ed.2d at 62. The court reasoned that the movements of Armstrong's and Petschen's cars that eventually led the police to Knotts's cabin could have been tracked through visual surveillance on public roads and that the "enhancement" of natural, visual surveillance capabilities with the use of "science and technology" did not raise a Fourth Amendment problem. Id. at 282, 103 S.Ct. at 1086, 75 L.Ed.2d at 63.
The Court next addressed the issue of electronic tracking in United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). In that case, the government was told by an informant that Karo and three confederates had ordered from him fifty gallons of ether, which is used to extract cocaine from clothing. Id. at 708, 104 S.Ct. at 3299, 82 L.Ed.2d at 537. With the informant's consent, the government installed a beeper in one of the cans used to transport the ether. Ibid. For the *122 next five months, the government used the beeper, together with visual surveillance, to track the movement of the ether. Id. at 708-10, 104 S.Ct. at 3300, 82 L.Ed.2d at 537-38. During part of this time, the ether was stored in public storage facilities and at other times in private residences. Ibid. The ether was eventually transported to a private residence in Taos, New Mexico. Id. at 709, 104 S.Ct. at 3300, 82 L.Ed.2d at 538. Based partly on evidence obtained through use of the beeper, the government secured a warrant to search the Taos residence. Id. at 710, 104 S.Ct. at 3300, 82 L.Ed.2d at 538. The execution of this warrant revealed cocaine and drug paraphernalia. Ibid. The lower federal courts invalidated the warrant on the ground that it was obtained based on information revealed by the beeper. Id. at 710, 104 S.Ct. at 3301, 82 L.Ed.2d at 538.
The Court described the primary issue presented by the appeal as "whether monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals information that could not have been obtained through visual surveillance," specifically the continuing presence of the ether within the Taos residence. Id. at 707, 104 S.Ct. at 3299, 82 L.Ed.2d at 536. The Court concluded that such use of a beeper, without a warrant, violates the Fourth Amendment. In reaching this conclusion, the Court stated:
Even if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises. . . .
. . . .
. . . Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight.
[Id. at 715-16, 104 S.Ct. at 3303-04, 82 L.Ed.2d at 541-42 (footnote omitted).]
However, the Court reaffirmed its holding in Knotts that the use of a beeper or other electronic tracking device for surveillance of a suspect's or contraband's movements along highways or in other public places does not violate the Fourth Amendment. See id. at 714-15, 104 S.Ct. at 3302-03, 82 L.Ed.2d at 540-42. The Court also concluded that the government had obtained sufficient evidence through such means to uphold the validity of the warrant for the search of the Taos residence. Id. at 719-21, 104 S.Ct. at 3305-06, 82 L.Ed.2d at 544-45. In reaching this conclusion, the Court stated that "it is evident that under Knotts there was no violation of the Fourth Amendment" in the use of the beeper to monitor the movement of the truck on public highways until it reached the Taos residence. Id. at 721, 104 S.Ct. at 3306, 82 L.Ed.2d at 545.
Courts in other jurisdictions have relied upon Knotts in concluding that the use of information derived from a suspect's cell phone to determine his general location does not violate the Fourth Amendment. See, e.g., United States v. Forest, 355 F.3d 942, 950-52 (6th Cir.2004), remanded on unrelated sentencing grounds, 543 U.S. 1100, 125 S.Ct. 1050, 160 L.Ed.2d 1001 (2005); Devega v. State, 286 Ga. 448, 689 S.E.2d 293, 300-01 (2010); Stone v. State, 178 Md.App. 428, 941 A.2d 1238, 1249-50 (2008).
In Forest, Drug Enforcement Administration (DEA) agents who were experiencing difficulty conducting visual surveillance of two suspects believed to be awaiting the arrival of a large shipment of cocaine dialed one suspect's cell phone, without allowing it to ring, and determined his general location by "cell-site data" provided by *123 the suspect's cell phone provider. 355 F.3d at 947. In determining that the use of this electronic tracking, together with visual surveillance, to follow and eventually arrest the suspects, did not violate the Fourth Amendment, the court stated:
[T]he cell-site data was used to track [the defendant's] movements only on public highways. The rationale of Knotts therefore compels the conclusion that [the defendant] had no legitimate expectation of privacy in the cell-site data because the DEA agents could have obtained the same information by following [the defendant's] car.
[Id. at 951.]
The court rejected the defendant's argument that his case was distinguishable from Knotts because he had a legitimate expectation of privacy in his cell site data even if he did not have a legitimate expectation of privacy regarding his location:
[T]he cell-site data is simply a proxy for [the defendant's] visually observable location. But as previously noted, [the defendant] had no legitimate expectation of privacy in his movements along public highways. We believe, therefore, that the Supreme Court's decision in Knotts is controlling and conclude that the DEA agents did not conduct a search within the meaning of the Fourth Amendment when they obtained [the defendant's] cell-site data.
[Id. at 951-52.][3]
Similarly, in Devega, the police ascertained a murder suspect's general location on a public highway by having his cell phone provider "ping" his phone. 689 S.E.2d at 299. In rejecting the defendant's argument that his trial counsel had been ineffective in failing to move for suppression of evidence on the theory that such electronic monitoring violated the Fourth Amendment, the court stated:
"The GPS tracking device [and `ping' information] in the case at bar is simply the next generation of tracking science and technology from the radio transmitter `beeper' in Knotts, to which the Knotts Fourth Amendment analysis directly applies." . . . Because the warrantless monitoring of his cell phone location revealed the same information as visual surveillance, there was no Fourth Amendment violation.
[Id. at 300 (quoting Stone, supra, 941 A.2d at 1250).]
We conclude, as did the courts in Forest and Devega, that the use by the police of information obtained from T-Mobile concerning defendant's general location, derived from signals emitted by his cell phone, which together with visual surveillance resulted in discovery of his car in a motel parking lot, did not violate any legitimate expectation of privacy defendant may have had regarding the location of his car. As in Knotts, "[w]hen [defendant] traveled over the public streets he voluntarily *124 conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction. . . and the fact of his final destination" at the motel, 460 U.S. at 281-82, 103 S.Ct. at 1085, 75 L.Ed.2d at 62, and "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them," id. at 282, 103 S.Ct. at 1086, 75 L.Ed.2d at 63.
We reach the same conclusion under Article I, paragraph 7, of the New Jersey Constitution. Our courts have long recognized that the driver of an automobile does not have a constitutionally protected right of privacy in the movements of his car on public roadways. See State v. Foley, 218 N.J.Super. 210, 214-18, 527 A.2d 482 (App.Div.1987). Our courts have also recognized that police officers may utilize modern technology in conducting surveillance of public places and private property that is not subject to constitutional protection. See State v. Marolda, 394 N.J.Super. 430, 442-46, 927 A.2d 154 (App.Div.), certif. denied, 192 N.J. 482, 932 A.2d 32 (2007). Our Supreme Court has construed the New Jersey Constitution to provide more extensive search and seizure protections than the Fourth Amendment only when a person has a reasonable expectation of privacy in particular information. See, e.g., State v. Reid, 194 N.J. 386, 395-402, 945 A.2d 26 (2008) (Internet subscriber information); State v. Hunt, 91 N.J. 338, 344-48, 450 A.2d 952 (1982) (telephone billing records). We conclude for all the reasons previously set forth that a person has no reasonable expectation of privacy in their movements on public highways or the general location of their cell phone, and therefore, there is no basis in this context for construing the New Jersey Constitution more expansively than the Fourth Amendment.
We have no occasion in deciding this appeal to determine whether a warrant would be required for the police to obtain cell phone information to determine the specific location of a suspect, particularly the suspect's location in a private place. We only hold that the Middletown police did not violate the Fourth Amendment or Article I, paragraph 7, of the New Jersey Constitution in utilizing the cell-site information provided by T-Mobile to assist in locating defendant to execute the warrant for his arrest.

IV.
Finally, defendant argues that the flat screen television and the luggage found in the middle of the motel room at the time of his arrest were unlawfully seized because the plain view exception to the warrant requirement did not apply. This argument is clearly without merit and only requires brief discussion. R. 2:11-3(e)(2).
For the plain view exception to apply, the State must show: (1) the police officer was "lawfully in the viewing area"; (2) the officer discovered the evidence "inadvertently, meaning that he did not know in advance where evidence was located nor intend beforehand to seize it"; and (3) the officer had "probable cause to associate the [item] with criminal activity." State v. Mann, 203 N.J. 328, 341, 2 A.3d 379 (2010) (quoting State v. Bruzzese, 94 N.J. 210, 236-37, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984)). All three of these prerequisites for the seizure of evidence under the plain view exception were satisfied. The police were "lawfully in the viewing area" because they had a warrant for defendant's arrest that authorized their entry into his motel room to execute. See Cleveland, *125 supra, 371 N.J.Super. at 294-95, 852 A.2d 1150. The police discovered the flat screen television and luggage "inadvertently" because they did not "know in advance" that this evidence would be found in defendant's motel room. Furthermore, the police officers had probable cause to believe that the flat screen television was criminal contraband because it was not the motel room television and was one of the items that had been stolen in the residential burglaries they were investigating. The officers also had reason to believe defendant possessed additional stolen property he could be transporting in the numerous suitcases standing in the middle of his motel room.[4]
Affirmed.
NOTES
[1] This finding is not challenged on appeal.
[2] Our Supreme Court has construed the New Jersey Constitution more broadly than the United States Constitution in one respect relating to consensual searches. In State v. Johnson, 68 N.J. 349, 354, 346 A.2d 66 (1975), the Court held that a consent to search must be shown to have been not only "voluntary," which is the federal standard, but also that the person who authorized the search had "knowledge of the right to refuse consent." Accord State v. Elders, 192 N.J. 224, 240-41, 927 A.2d 1250 (2007). This higher standard for the validity of consent searches under the New Jersey Constitution is not implicated in the present appeal because defendant does not dispute the trial court's factual finding that Gates's consent to the search of the storage unit was both voluntary and knowing.
[3] In addition to rejecting defendant's Fourth Amendment argument, the court in Forest also rejected defendant's argument that suppression of the evidence against him was required under the Electronic Communications Privacy Act of 1986 ("ECPA"), Pub.L. No. 99-508, 100 Stat. 1848 (1986), which amended Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 212. 355 F.3d at 948-50. The court questioned whether this federal statute would apply to the cell site information provided by the defendant's cell phone provider, but concluded it did not have to decide the issue because none of the arguably relevant sections of the statute provide a "suppression remedy" for a violation. Id. at 949-50; see also In re Pen Register & Trap/Trace Device with Cell Site Location Auth., supra, 396 F.Supp.2d at 753-65. Defendant did not rely upon any federal statutory provision in seeking suppression of the evidence found in the motel room at the time of his arrest.
[4] As previously noted, defendant does not challenge the validity of his consent to the search of the luggage after it was brought to police headquarters.